IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| QUANTUM VALVE AND OILFIELD SOLUTIONS, LLC | § § § § | CASE NO. 21-40994 (Chapter 11) |
| DEBTOR | § § | |

### DECLARATION OF LUKE REED IN SUPPORT OF
### DEBTOR'S CHAPTER 11 PETITION AND OTHER MOTIONS

1. "My name is Luke Reed. I am over 21 years of age and am competent to make this declaration under penalty of perjury (the "*Declaration*"). I am the President and Chief Executive Officer of Quantum Valve and Oilfield Solutions, LLC, the debtor and debtor in possession in the above-captioned bankruptcy case (the "*Debtor*" or "*Quantum*"). I attended Oklahoma State University where I earned a B.S. degree in Biosystems Engineering. I have extensive experience in the oil and gas industry. Prior to my position with the Debtor, I served as Lead Engineer in Willowbend Investments where I oversaw several hundred wells through the major U.S. Basins and was employed with Halliburton as a mentor for cement engineer program. I began working with the Debtor in 2015.

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my personal interaction with fellow members of the Debtor's senior management, the Debtor's Board, and other of the Debtor's advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

## OVERVIEW

3. Quantum is a Texas limited lability company that provides services and equipment to numerous upstream oil and gas companies in Texas and Oklahoma. Quantum's range of services include pumpdown, chemical sales, blowout preventers, frac-stacks, and flowback. The Debtor currently has approximately sixty-one (61) employees.

4. The instant bankruptcy filing was the result of several setbacks the Debtor has suffered recently. First, the COVID-19 pandemic has negatively impacted cash flow due to fluctuating oil rates during 2020 which resulted in debts and liabilities. Second, the Debtor has been involved in a variety of lawsuits, garnishment actions and attempt to collect by unsecured creditors prompting the necessity to file.

5. The filing of this case and the protection of the automatic stay will provide the Debtor with much-needed breathing space and economic stability to negotiate and confirm a plan of reorganization for its past debts and alleged liabilities. Through this case, the Debtor intends to focus its efforts and resources on moving forward to make Quantum financially sounds so it can continue to provide the highest quality of service to its clients.

## SUMMARY OF MOTIONS

6. I have read and reviewed the following Motions (including the exhibits attached thereto) and the allegations contained in each are true and correct to the best of my knowledge, information, and belief: *(i) Emergency Motion for Authority to Use Cash Collateral of Crestmark, a division of MetaBank, National Association; Authority to obtain Post-Petition Secured Credit and Providing Adequate Protection; Request for Emergency Hearing and Giving Notice of Final Hearing Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) (the "**Cash Collateral and Financing Motion**"), and (ii) Motion for Authority to Pay Pre-Petition Wages (the "**Wages Motion**").*

7.  I believe the relief sought in the Cash Collateral and Financing Motion and Wages Motion (a) is in the best interest of the Debtor; (b) is vital to enable to the Debtor to continue operations and provide services to its clients; (c) constitute a critical element in achieving the Debtor's successful reorganization.

**A. Cash Collateral and Financing Motion**

8.  Crestmark, a division of MetaBank, National Association (the "***Bank***" or "***Crestmark***"), asserts a senior security interest in the Debtor's cash collateral secured by a recorded UCC financing statement filed on November 20, 2018, in which Crestmark asserts a lien against all assets, including all accounts, account receivables and inventory. In addition to agreeing to the use of Cash Collateral, Crestmark has agreed to provide Post-Petition Debtor-in-Possession financing to the Debtor ("***DIP Indebtedness***"). As such, the Debtor seeks authority to incur DIP Indebtedness with Crestmark pursuant to 11 U.S.C. §364(c), provide Crestmark adequate protection, and to use its Cash Collateral.

9.  As of July 7, 2021, the Debtor was indebted to the Bank under the Line of Credit Loan in the approximate amount of $1,136,627.00, and under the Term Note in the approximate principal amount of $2,649,653.00, plus interest, fees and costs allowed under the Pre-Petition Loan Documents (the "***Pre-Petition Indebtedness***"). The Debtor has timely made all pre-petition payments due through regular electronic auto-drafts from its outstanding receivables paid directly to the Bank.

10. The Debtor's regular business operations and use of its assets generates sales on a consistent basis. The Debtor's tangible and intangible assets, including funds derived from the operation of its business, are subject to the Bank's lien and are the Bank's cash collateral. The Debtor has approximately $3,680,193.71 in cash collateral via outstanding receivables and cash

on hand. The Debtor's cash collateral is fully encumbered by Crestmark's senior security interest. As such, other creditors asserting an interest do not have a secured claim as the value of the cash collateral does not exceed the security interest of Crestmark.

11. In order to operate, the Debtor must be able to use the cash in its bank accounts and the proceeds of its receivables to pay its employees and other expenses of operation. Such cash and proceeds are arguably the cash collateral of Crestmark within the meaning of 11 U.S.C. §363(a) ("*Cash Collateral*").

12. In addition to its use of Cash Collateral, an immediate need exists for the Debtor to obtain approval of a DIP financing arrangement to ensure sufficient funds are available to pay payroll, utilities, and vendors as well as acquire additional inventory and pay other ongoing expenses in the ordinary course of the Debtor's business. Without immediate authorization, the Debtor's ability to operate will be severely impaired. A complete shutdown of the business will result in diminished value collateral securing the interests of secured parties and the possibility that unsecured creditors will receive no meaningful distribution.

13. The Debtor desires that the Bank continue its existing line of credit under the terms of the Pre-Petition Loan Documents, as modified in the Cash Collateral and Financing Motion, to enable the Debtor to continue to operate pursuant to the terms and conditions described in the proposed Interim Order. More specifically, the Cash Collateral and Financing Motion seeks authority to allow the Bank may make Advances to the Debtor which may not exceed the lesser of Two Million Dollars ($2,000,000.00) or eighty five percent (85%) of the Eligible Accounts (the "*Advanced Formula*"). Pending the final hearing, Debtor seeks to borrow up to $600,000.00, which is the amount necessary to avoid immediate and irreparable harm under Bankruptcy Rule 4001(c)(2) and the value the Debtor estimates it may receive in Eligible Accounts. Bank shall

have no obligations hereunder beyond the Final Hearing Date unless this Order becomes a Final Order.

14. Due to, among other things, the Debtor's strained financial condition and its industry, the Debtor has been and is unable to obtain unsecured credit under Bankruptcy Code § 503(b)(1). The Debtor firmly believes that postpetition financing on an unsecured basis within the timeframe necessary is unobtainable. The Debtor, via its proposed counsel, has contacted lenders and been informed that a lending arrangement similar to the DIP Indebtedness is not offered.

15. The terms of the DIP Indebtedness and adequate protection arrangements were negotiated at arm's-length, are fair and reasonable under the circumstances, and reflect the exercise of prudent business judgment by the Debtor consistent with its fiduciary duties. Without access to the DIP Indebtedness, the Debtor does not have sufficient available sources of working capital or cash to continuous operations. The proposed postpetition financing will fund necessary expenses of operation in the ordinary course, payroll, and purchase supplies, pay adjusting costs, and pay other essential costs as the Debtor moves toward the negotiation and confirmation of a plan.

**B. Wages Motion**

16. The Debtor seeks an order, pursuant to sections 105(a) and 507(a) of the Bankruptcy Code and FED. R. BANKR. P. 6003(6), authorizing the Debtor to pay outstanding Prepetition Employee Obligations (as defined below) with respect to employees of the Debtor, authorizing Paylocity and the banks at which the Debtor maintains its accounts to receive, process, honor and pay all payroll related checks, drafts, wires, or automated clearing house transfers, without regard to when the applicable Prepetition Employee Obligations check was issued. The Debtor also seeks entry of any other orders necessary to grant the relief requested.

17. The Debtor has approximately sixty-one (61) employees paid on a bi-weekly basis

and scheduled on two separate payroll periods (the "*Employees*").

18. As of the Petition Date, the Debtor owed to its Employees certain prepetition obligations, including without limitation: (a) amounts for wages, salaries, and reimbursable expenses; and amount for (b) employee Health Savings Accounts, insurance expenses for various coverages, including but not limited to employee health, critical illness, short and long term disability, life and dental. In addition to providing these obligations, the Debtor may be required to make deductions from Employee payroll related to, for an example, employee contributions to federal, state, and local tax withholdings, garnishments, support payments, or other similar programs. Collectively, these items will be referred to as "*Prepetition Employee Obligations*".

19. Thirty-one (31) corporate and wellhead employees are scheduled to receive payment on July 16, 2021 for services performed from June 21, 2021 to July 7, 2021. As such, approximately twenty-one (21) days of pre-petition wages are scheduled to be paid. The pre-petition wages owed to corporate and wellhead employees total approximately $143,242.66.

20. Thirty (30) pumpdown employees are scheduled to receive payment on July 23, 2021, for services performed from July 5, 2021, to July 18, 2021. As such, approximately seven (7) days of pre-petition wages are scheduled to be paid. The pre-petition wages owed to pumpdown employees total approximately $48,378.17.

21. As the Petition Date is nearly in the middle of both Employee payroll cycles, the Debtor estimates that the total Prepetition Employee Obligations owed to its Employees is approximately $195,104.34. Moreover, no individual employee is owed in excess of $13,650.00 in prepetition wages or salaries.

22. The relief sought herein is essential to the success of the Debtor's' chapter 11 case. Here, to achieve success, it is critical that the Employees are paid without interruption and that the

Debtor continues to honor its existing practices and policies for the pecuniary benefit of the Employees. Such payments are necessary to prevent irreparable harm to the morale of the Employees at the very time when their dedication, confidence, and cooperation are vital to this case. In addition, the Debtor will not pay any amount (as requested herein) over the priority caps in sections 507(a)(4) and (5).

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on July 12, 2021, in Dallas County, Texas.

Signed: _____
Luke Reed